**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 12-60294-Cr-SCOLA/O'SULLIVAN**

UNITED STATES OF AMERICA,

vs.

GREGORY RICHARDSON,

      Defendant.

_____/

<u>**ORDER DENYING DEFENDANT'S MOTION TO**</u>
<u>**SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE**</u>

      The employees and customers of the SunTrust Bank in Coral Springs were going about their normal banking business on November 14, 2012 when they were suddenly interrupted. Defendant Gregory Richardson, who was wearing black clothing and a blue bandanna covering his face and carrying a large metal C-clamp, and Co-defendant, Edward Rogers, who was wearing a red shirt and bandanna covering his face and carrying a firearm and tire iron, stormed into the bank's lobby. These images were captured by the bank's surveillance cameras:

 

      Once inside the bank, the two men terrorized the bank employees and customers (note the customer lying on the floor covering his head in the photo on the right). Richardson jumped over the counter and, using a black trash bag, collected over $20,000 in cash. The two robbers then ran out of the bank and fled in a stolen Nissan Sentra. They were seen dumping the Sentra a few blocks away and jumping into a secondary get-away vehicle (Dodge Charger) owned by Co-defendant Quinton Johnson and driven by Co-defendant Carlos Jenkins.

Following a high-speed, two-county police chase, the Charger crashed.  The Defendant tried to flee on foot but was quickly caught by police as he tried to climb a fence along the highway.

The stolen money, hats, bandannas and gloves were found inside the Charger and a 9 mm gun was found inside the Sentra.

The Defendant was taken to the FBI headquarters where he confessed to his involvement in the SunTrust bank robbery as well as his involvement in several other similar bank robberies. The Defendant also identified himself and his co-perpetrator Edward "Baldy" Rogers in surveillance photos from the SunTrust robbery and other bank robberies.

On May 20, 2013, the Defendant filed a Motion to Suppress Statements and Physical Evidence [ECF No. 97].   Richardson alleges that law enforcement officers violated his constitutional rights by failing to obtain a knowing and voluntary waiver of his *Miranda* rights, by failing to honor his request to remain silent and by coercing him into making a statement by threatening to arrest his girlfriend.   Richardson asks the Court to suppress his post-arrest statements and the physical evidence obtained as a result of the statements because of these alleged violations. On June 6, 2013, this Court held an evidentiary hearing on the motion.

Having considered the motion, the record, and the relevant legal authorities, and for the reasons explained in this order, Richardson's Motion to Suppress is **denied**.

## LEGAL STANDARD

A defendant's "[s]tatements obtained in violation of *Miranda* . . . are not admissible at trial."[1]  *United States v. Cobb*, 369 F. App'x 59, 63 (11th Cir. 2010).  To overcome a motion to suppress, the Government must establish by a preponderance of the evidence that the defendant waived his rights voluntarily, knowingly, and intelligently.  *United States v. Glover*, 431 F.3d 744, 748 (11th Cir.2005).  "A defendant's waiver of his *Miranda* rights is knowing and voluntary where, 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and it was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Cobb*, 369 F. App'x at 63 (quoting *United States v. Beckles*, 565 F.3d 832, 840 (11th Cir. 2009)).

---

[1] In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme Court established that unless law enforcement officers give certain specified warnings prior to questioning a person in custody, and follow specified procedures during the course of an interrogation, the state may not use in its case any statement by the suspect, over the suspect's objection.

Physical evidence derived from an unconstitutional confession may be excluded if it is "the fruit of the coerced confession." *United States v. Lall*, 607 F.3d 1277, 1291 (11th Cir. 2010) (explaining that the exclusionary rule does not apply to physical evidence where a "predicate for its admissibility can be satisfied without resort to the confession").

<u>SUMMARY OF TESTIMONY PRESENTED AT EVIDENTIARY HEARING</u>

*Law Enforcement Officers' Testimony*

Special Agent Jason Van Loan testified that on November 14, 2012, a short time after Richardson had been arrested with two co-defendants fleeing from a bank robbery at SunTrust Bank, he and Detective David Young interviewed Richardson at the FBI headquarters. Van Loan and Young were wearing civilian clothing and neither was armed. No other officers had spoken to Richardson prior to this interview. Van Loan observed that Richardson had no signs of any physical injuries. Van Loan asked Richardson if he was willing to speak about what transpired earlier that day and Richardson responded "ya'll got me for whatever ya'll got me for; what do we need to talk about?"

Richardson indicated that he was not under the influence of any drugs or alcohol and that he did not suffer from any mental deficiencies. Van Loan then read Richardson his *Miranda* rights using a pre-printed Advice of Rights form. Richardson initialed each of the rights indicating that he understood them. Richardson also indicated he was willing to waive his rights and speak to the agents and signed the form on the bottom beneath the section entitled "Waiver of Rights." When Van Loan asked Richardson about his participation in the SunTrust Bank robbery that had occurred earlier in the day, Richardson readily gave a description of the robbery. The details provided by Richardson matched the video surveillance from the robbery which Van Loan had reviewed. Though Richardson gave a full account of his own participation in the robbery, he claimed to have little or no knowledge of the other participants. Richardson also told Van Loan about his background, including the fact that he was on supervised release after serving a prison sentence for bank robbery. Richardson told Van Loan he had been laid off from work and committed the robbery to obtain money to support his girlfriend and her daughter. Richardson also said his mother lived in South Carolina and his sister lived in Carol City.

Richardson never asked for an attorney and never refused to answer any questions during this interview. Nor did he ever ask that that questioning cease. In fact, the tone of the interview was professional and conversational and Richardson was cooperative throughout the interview.

Van Loan and the other agents were aware of several other robberies in the area in which the surveillance videos showed those robberies were committed using substantially similar methods as the SunTrust robbery. Van Loan left the interview room for a few minutes and returned with Detective Jerrard Starkey. Richardson had been offered food and drink and was given six hamburgers and a soda to eat and drink. Starkey, using the same Advice of Rights form that Van Loan had utilized, re-read Richardson his *Miranda* rights. Once again, Richardson said he understood his rights and agreed to further questioning by Detective Starkey. Van Loan left the room before any questioning took place regarding the SunTrust robbery or any prior bank robberies.

Detective Starkey told Richardson that the videos in the other bank robberies showed remarkable similarities with the SunTrust robbery. Richardson readily agreed to talk about those other robberies and did not express reservation about identifying others who participated in the robberies. Richardson did express concern for the safety of his girlfriend at the hands of the accomplices. Richardson explained that was the reason he was not forthcoming with Van Loan about the identity of the other participants. Richardson was not under any duress during this interview. In fact he was calm and confessed to all of the robberies and even initialed and signed the bank robbery surveillance photographs identifying himself and his co-defendant in the photos.

### Richardson's Testimony

Richardson testified that on November 14, 2012, he participated in robbing the SunTrust Bank. He was arrested while trying to climb a fence after trying to escape officers by car and then by foot. He attributed his involvement to his need to provide for his fiancée, Lakeisha Jones, and her daughter, Crystal Jones, after he had been laid off by his previous employer because business was slow.

Following his arrest Richardson was questioned about the robbery at the FBI headquarters. Richardson was met by Special Agent Jason Van Loan in an interrogation room. Agent Van Loan asked Richardson if he would like to be read his *Miranda* warnings. Richardson responded "I already know my rights." Richardson testified that when Agent Van Loan asked him what happened, he responded "ya'll got me for what ya'll got me for." After this statement, Richardson continued responding to questions about his background and family. Questioning then ceased temporarily when Agent Van Loan left Richardson alone for

approximately an hour.

When Agent Van Loan returned, he was accompanied by Task Force Officer Jerry Starkey.  One of the officers read Richardson his *Miranda* warnings, but Richardson states that he did not respond to the officer after his rights were read, and the officers continued with the interrogation.  Richardson claims that he never initialed or signed the Advice of Rights form that Officer Starkey produced.

Officer Starkey commented that Richardson was facing a life sentence.  Officer Starkey then proceeded to show Richardson pictures of other bank robberies, and asked Richardson if he recognized any of the individuals in the pictures.  Richardson denied knowing any of the people photographed, yet the officers continued to question him.  Richardson testified that he agreed to let the officers search his phone and further agreed to give his DNA sample because he had nothing to do with the other robberies that the officers were trying to link him to.

Richardson testified that one of the officers threatened that law enforcement would arrest his fiancée unless he signed the photographs and identified the accomplices in the other pictures. Richardson proceeded to follow the officer's instructions and identified others in the pictures while also signing a picture incriminating himself.  Richardson attributed his willingness to sign the photographs to protecting the love of his life, Lakeisha Jones.  He testified that he was pressured into signing the photographs because of the threats to arrest his girlfriend.  Richardson testified that he conceded and signed the photos because he was unwilling to take the chance of letting them take his fiancée away from her daughter.

### DISCUSSION

Richardson makes three arguments as to why the evidence gained from his interrogation should be suppressed: (1) he was not read his Miranda rights before the interrogation occurred; (2) he invoked his right to remain silent but the interrogation continued; and (3) he was unlawfully coerced into incriminating himself and signing the photographs.  Richardson argues that when taking into account the totality of the circumstances, the statements and the evidence were obtained in violation of *Miranda*. The Government responds that Richardson knowingly, intelligently and voluntarily waived his constitutional rights and that Richardson was never threatened or coerced by the government agents.

## *Was there interrogation before Richardson was read his Miranda rights?*

The Supreme Court in *Miranda* specified procedural requirements that law enforcement officers need to follow before questioning a person in custody.  Interrogation cannot occur before a suspect in custody is given his *Miranda* rights.  *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007).

Richardson moves to suppress any statements made prior to his being read his *Miranda* rights.  Richardson argues that, under the totality of circumstances, he was in custody once he was asked "Do you know why you're here?"  Richardson's counsel points to the fact that this type of question is a form of interrogation, because interrogation occurs not only with express questioning, but when police officers know that their words or actions "are reasonably likely to elicit a response." *Rhode Island v. Innis*, 466 U.S. 291, 301 (1980).   The Court need not reach the issue of whether a statement by the police – "do you know why you are here?" – is the functional equivalent to interrogation because no such statement was made by the agents in this case.

The Court credits the testimony of Van Loan and finds that the introductory question by Van Loan was a simply inquiry as to whether the Defendant was willing to speak to the agents. The Defendant indicated that he was willing to do so and, after speaking to the Defendant briefly about his background, Van Loan read the Defendant his rights from an Advice of Rights form. Richardson knowingly, intelligently and voluntarily waived his *Miranda* rights and agreed to speak to Van Loan without an attorney being present.

The Court finds that there was no interrogation prior to the waiver of *Miranda* rights.

### *Did Richardson invoke his right to remain silent?*

A person's invocation of his or her right to remain silent must be made unambiguously. *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2260 (2010).  A statement made resulting from coercion, after a person invokes his right to remain silent, is excluded from evidence.  *Michigan v. Mosely*, 423 U.S. 96, 102 (1975).  A person's right to remain silent must be meticulously honored, or the statements made should be suppressed.  *Id. at* 104.

Richardson moves to suppress evidence after he allegedly invoked his right to remain silent.  Richardson asserts that once his right to remain silent was invoked, questioning should have ended.  Richardson's argument hinges on the fact that his statement – "ya'll got me for what ya'll got me for; what do we need to talk about?" – was a clear invocation of his right to

remain silent.

Richardson argues that the statements made after he invoked his right to remain silent should be suppressed because his right was not "scrupulously honored." *Id.* But, in order to invoke his right to remain silent, a "suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994). The statement – "Ya'll got me for what ya'll got me for; what is there to talk about?" – is not a clear, unambiguous invocation of silence to begin with. *See Berghuis*, 130 S.Ct. at 2260. If anything, the most plausible explanation for the statement is: you caught me red-handed; how can I deny anything? This is more of a confession than an unequivocal assertion of a right to remain silent. Richardson's waiver of *Miranda* rights on two separate occasions and his full cooperation throughout the interviews further belie any claim that he ever intended the statement to invoke his right to remain silent by this statement. The Court finds that Richardson never invoked his right to remain silent.

*Were Richardson's statements – and the photographs he initialed and signed – the product of unlawful coercion by the Government agents?*

Richardson claims that his statements and the photographs he initialed and signed were a direct result of the police officer's unlawful coercion. Although not being given the *Miranda* rights is one factor in determining the voluntariness of a confession, other aspects need to be considered as well. Specifically, Richardson asserts that the threats to arrest his girlfriend if he did not sign the photographs render the statements and photographs inadmissible. *Cf. United States v. Estelan*, 156 F. App'x 185, 194 (11th Cir. 2005) (noting that in a *habeas* case, a confession was found to be involuntary where the police pretended that, if the defendant did not confess, the defendant's ailing wife would be arrested) (citing *Rogers v. Richmond*, 365 U.S. 534, 535 (1961)). Richardson argues that the situation in *Rogers* is very similar to his case in that he identified himself in the photographs, thus incriminating himself, only because of the threats made to arrest his girlfriend.

The Court finds that no improper coercion took place. Richardson did express concerns about his girlfriend's safety to the agents, but this fear resulted from the possibility that his accomplices in the robberies knew where she lived, and could harm her if Richardson implicated them. Richardson remained calm and cooperative throughout the interviews with both Van Loan

and Starkey.  On two occasions he was shown the Advice of Rights form and indicated his willingness to be interviewed without a lawyer present. Additionally, Richardson was never threatened or pressured into incriminating himself, and was treated cordially throughout the process.  He was allowed to use the bathroom when requested and was even given a meal to eat and soda to drink.

## CONCLUSION

The Court finds that no interrogation took place prior to any waiver of *Miranda* rights, the Defendant knowingly, voluntarily and intelligently waived his *Miranda* rights on two occasions and the Defendant's statements and his initialing and signing the surveillance photographs were not a result of coercion.  Thus, the Motion to Suppress (ECF No. 97) is **DENIED**.

**DONE and ORDERED** in chambers, at Miami, Florida, on June 13, 2013.

**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**